Filed 11/21/22 P. v. Gomez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS GOMEZ,<br><br>    Defendant and Appellant. | F082873<br><br>(Super. Ct. No. BF180050A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. Judith K. Dulcich, Judge.

Vanessa Place, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, Kelly E. LeBel and Robert K. Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Carlos Gomez engaged law enforcement in a high-speed vehicle chase, and a jury convicted him of charges including shooting from a vehicle at a police officer with gang and firearm enhancements. Defendant argues that the evidence was insufficient to support the gang enhancements, the trial court erred in failing to bifurcate the gang enhancements from the underlying charges, and that we should overturn his convictions and remand for retrial in light of recently enacted Penal Code[1] section 1109, which requires bifurcation of gang enhancements from the trial of the underlying charges when requested by a defendant.

The People concede that the gang enhancements are not supported by sufficient evidence but argue that the trial court did not abuse its discretion in denying defendant's motion to bifurcate the trial of the gang enhancements, section 1109 is not retroactive, and the trial court's decision not to bifurcate was harmless in any event. We reverse the true findings as to the gang enhancements and will remand for resentencing. We affirm the judgment in all other respects.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an information on March 3, 2020, charging defendant with premeditated and deliberate attempted murder of a peace officer (§§ 187, subd. (a), 664; count 1), shooting at an occupied vehicle (§ 246; count 2), assault with a firearm on a peace officer (§ 245, subd. (d)(1); count 3), felon in possession of a shotgun (§ 29800, subd. (a)(1); count 4), and evading a peace officer (Veh. Code, § 2800.2; count 5). The information also alleged that defendant personally discharged a firearm (§ 12022.53, subd. (c)) as to counts 1 through 3 and acted to benefit a criminal street gang (§ 186.22, subd. (b)(1)) as to counts 1 through 4. Defendant pleaded not guilty to the charges and denied all allegations.

---

[1]     Undesignated statutory references are to the Penal Code.

2.

After a 15-day trial, the jury convicted defendant on April 16, 2021, of shooting at an occupied vehicle, assault with a firearm on a peace officer, felon in possession of a shotgun, and evading a peace officer as charged in counts 2 through 5. The jury also found true the enhancements that the crimes were committed for the benefit of a criminal street gang (counts 2–4) and that defendant personally and intentionally discharged a firearm (counts 2, 3). The jury acquitted defendant of premeditated and deliberate attempted murder of a peace officer.

On June 4, 2021, the trial court denied defendant's motion to strike the gang and firearm enhancements and sentenced defendant to a term of 27 years to life as to count 2 (§§ 246, 186.22, subd. (b)(1), (4)). As to count 3, the trial court sentenced defendant to the upper term of eight years, plus five years (§ 186.22, subd. (b)(1)), plus 20 years (§ 12022.53, subd. (c)), stayed pursuant to section 654. As to count 4, the trial court sentenced defendant to the upper term of three years, plus four years (§ 186.22, subd. (b)(1)), stayed pursuant to section 654. The trial court sentenced defendant to the upper term of three years as to count 5 and ordered that term to be served consecutively to count 2, for a total term of 30 years to life in prison.

The court also imposed a $300 restitution fine (former § 1202.4), a stayed $300 parole revocation restitution fine (§ 1202.45, subd. (a)), victim restitution in an amount to be determined by probation (former § 1202.4, subd. (f)(2)), $160 in court operations assessments (§ 1465.8), and $120 in criminal conviction assessments (Gov. Code, § 70373).

Defendant filed this timely appeal on June 4, 2021.

**FACTS**

**I.    The vehicle pursuit.**

On November 7, 2017, at approximately 11:15 p.m., Deputy Richard Santos of the Kern County Sheriff's Office was working patrol when he observed defendant's green

Nissan Altima (the vehicle) driving past him. Believing that the vehicle matched that of one reported stolen, Santos activated his emergency lights to stop it. Defendant initially slowed the vehicle and pulled into a gas station but then accelerated, drove over a curb, and sped off down the street. Santos did not notice any defects in the rear window of the vehicle when he initially attempted to stop it, and the rear window of the vehicle was still intact after driving off the curb.

Defendant accelerated to approximately 65 miles per hour as Santos activated his siren and advised dispatch that he was in pursuit. Defendant turned the vehicle at an intersection and increased speed to approximately 85 miles per hour. Defendant ran the red light at the next intersection and entered the following intersection at approximately 85 miles per hour. Santos slowed through the intersection and, after checking for cars and pedestrians, saw "unknown projectiles" coming toward him as he refocused on the vehicle. Santos's patrol vehicle was approximately 15 feet from the vehicle when the projectiles hit the patrol vehicle's windshield. He immediately notified dispatch that the vehicle had cleared the intersection and was now missing its rear window.

Due to the siren and radio noise inside his vehicle, Santos did not hear any noise from outside his patrol vehicle. He did not see a shotgun or notice any muzzle flash and was not looking at the vehicle just before its rear window shattered. In addition, Santos did not expect to see a muzzle flash due to the heavy tinting on defendant's rear window, which obstructed his ability to see inside.

Kern County Sheriff's Deputies Timothy Monsibais and Christopher Gonzalez responded to assist Santos. While approximately three or four car lengths behind Santos, both deputies saw the vehicle's rear window shatter as defendant drove over a gutter line in the intersection. Monsibais observed the rear window "blow out" while Gonzalez testified that he saw the rear window "shatter and fall." Neither deputy saw a muzzle flash, and Monsibais testified that he did not hear a gunshot although he acknowledged

4.

that the noise inside his vehicle was very loud. Gonzalez testified that he heard a loud "boom" before the rear window broke. The deputies described the gutter line as a dip in the road. Monsibais described it as shallower than the height of a curb and testified that he did not see either the vehicle or Santos's patrol vehicle bounce as they crossed it. Nothing happened to their own patrol vehicles when they drove over the gutter line.

Defendant, the only occupant of the vehicle, continued to flee from Santos through a residential area known as Rexland Acres. Defendant continued through the area at approximately 40 miles per hour on the 25-mile-per-hour residential streets, ignoring stop signs and making quick turns. Defendant then intentionally turned off the headlights and running lights of the vehicle eliminating any outside illumination. Defendant continued to run stop signs as he drove through the neighborhood.

During the pursuit, E.S. called 911 and reported hearing gunshots near his residence, which was located along the route of the vehicle pursuit. E.S. testified that he heard one or two gunshots while lying in bed, went to the front window, then called the police. During the 911 call, E.S. reported three gunshots that he heard within 10 minutes of his call. He estimated that three or four minutes passed while he went to the window and another three or four minutes later, E.S. saw vehicles drive by, one without its lights on. E.S. saw the vehicle without its lights on twice, once with its lights on and a second time with its lights off and being followed by police. E.S. refused to provide his name to the operator and testified that it was dangerous for his family and he would not make a report again because he did not want to be in court.

The vehicle eventually entered an alleyway near a church and defendant jumped from it while the vehicle was still moving at approximately 10 to 15 miles per hour. The vehicle ultimately stopped when it collided with a chain link fence. Santos saw defendant on the ground just after defendant jumped from the vehicle. Defendant ran through a fence into a residential area, and Santos chased him on foot. Santos

5.

apprehended defendant after defendant ran through defendant's own backyard and into a dirt field where he fell. The foot pursuit lasted approximately one minute.

Deputies pursued the vehicle for approximately five to six miles, and six minutes elapsed from when Santos first contacted dispatch regarding the pursuit until defendant was in custody.

Santos discovered that he had been injured during the pursuit when he found a piece of glass embedded in his right ear. His face was itchy and scratchy as well, most likely from tiny particles of glass. Santos testified that the hood of his patrol vehicle was missing paint and appeared to have been struck with pellets. He also observed several large impressions on the windshield consistent with pellet strikes from a shotgun shell and two circular dents over the left rear wheel well. In addition, the left passenger side spotlight faced backwards. The spotlight is very rigid and would not have repositioned itself unless something traveling "at a good amount of speed" impacted it. Santos observed the same type of pellet splatter to the lens and housing of the spotlight.

After defendant's arrest, Santos found a live 12-gauge Remington shotgun shell composed of birdshot pellets in the right front pocket of defendant's pants. During a search of the vehicle, Monsibais saw unused shotgun shells in the back seat, and officers later seized a bag containing 12 live Remington and Winchester 12-gauge shotgun shells and a single shell that was outside of the bag. Although vehicle glass was found on the rear seat, no glass was found on top of the bag of shotgun shells.

Based upon the damage to his patrol vehicle and the shotgun shell in defendant's pocket, Santos believed that defendant fired on him during the pursuit. The circular pattern of the damage to the patrol vehicle was consistent with pellet shot. In addition, Santos participated in approximately 15 pursuits and never saw a rear window shatter like the vehicle's did.

6.

Senior Deputy Ryan Brock was working patrol when he heard that Santos was engaged in a vehicle pursuit. By the time he responded, defendant was already in custody and Brock was assigned to canvass the area for a possible weapon that was discarded from the vehicle. Retracing the path of the pursuit, Brock recovered a Mossberg shotgun, with its barrel shortened to 15 inches, from an intersection in Rexland Acres. The shotgun was lying in the middle of the road, consistent with having been thrown from a driver's window. He did not see any used or live shotgun shells in the area, and the shotgun was not loaded. Because Santos used caution when traveling through intersections during the pursuit, he sometimes lost sight of the vehicle and would not have seen defendant throw anything from the vehicle.

While set up at the perimeter, Gonzalez heard over the radio that Santos had defendant in custody. Gonzalez returned to the intersection where the windshield had shattered to preserve any evidence. He observed a large amount of glass shards held together by window tint in the intersection. The glass and window tint were found on the southbound side of the road, along the median and the west shoulder area. The area did not appear to have any potholes. Gonzalez blocked off the area and waited for technical investigators to arrive.

Officers did not find any spent shotgun shells in the vehicle, near the shotgun, or in the area where the vehicle's rear window broke. Officers did not find any birdshot during their searches, but birdshot is difficult to find due to its small size and the distance over which it can travel.

## II.     Evidence relating to whether defendant shot at Santos.

### A.     Prosecution Firearm and Accident Reconstruction Experts

Santos's patrol vehicle had damage to the front bumper, push bumper, hood, passenger side fender, light bar, GPS antenna, and windshield. Pieces of glass were found lodged in the front bumper, push bumper, light bar, and GPS antenna. The paint in

7.

the areas where the glass was found was not scratched or damaged. The damage to the patrol vehicle was consistent with two or three shots from a shotgun.

The windshield of the patrol vehicle had several circular marks, cracks, and indentations. The damage was consistent with shotgun birdshot and concentrated on the passenger side of the windshield. The hood and front of the patrol vehicle had several circular indentations where paint had been removed and was consistent with damage from birdshot. Similar circular indentations were found on the push bumper on the passenger side of the patrol vehicle, top of the bumper, and passenger side front fender.

The passenger side spotlight on the hood of the patrol vehicle was pointing toward the ground. Spotlights cannot usually be moved without using the interior handles and will not move on their own even during a high-speed chase. Glass was embedded in the exterior of the spotlight and the lens was cracked. The spotlight of the patrol vehicle also exhibited damage from birdshot.

An evidence technician for the Kern County Sheriff's Office lifted latent prints from the shotgun that matched those of defendant. The shotgun had a pistol grip that allowed one to hold and shoot the shotgun with one hand, and its barrel had been illegally shortened to approximately 15¼ inches. It was possible for an individual to fire the shotgun while maintaining one hand on a steering wheel, rack the firearm to expel a spent casing, and shoot again while driving. The shotgun had a pump action, meaning that the forward grip on the barrel needed to be moved forward and backward to load or eject casings. Once a shotgun cartridge was placed in its chamber, the shotgun would fire by pulling the trigger. Pellets from a shotgun move faster toward a vehicle than broken glass. Lead pellets are softer than steel and will usually hit but not penetrate a steel target.

Eight Remington and five Winchester 12-gauge shotgun shells were found in the vehicle. One shell of each brand was taken apart, photographed, and test-fired. Pellets

from each shotgun shell measured approximately two millimeters and matched the two-millimeter indentations on the hood of Santos's patrol vehicle. Each cartridge had several hundred pieces of birdshot. The broken automobile glass collected from the roof tray under the patrol vehicle's light bar and under the GPS antenna on its roof were not circular.

The vehicle was missing its rear window after the pursuit, although portions of the glass and tint were intact at the window edge. The vehicle had a taped-over bullet hole in the trunk next to the passenger side taillight. A second bullet hole located just above the rear window showed evidence of rust.

Sergeant John Kolter, employed by the California Highway Patrol and supervisor of the Multidisciplinary Accident Investigation Team, testified as one of the prosecution's experts. He explained that windshield glass is laminated and composed of layers of glass sandwiching plastic that strengthens it. A windshield is meant to maintain structural integrity when impacted by something. In a crash, a windshield will shatter but remain intact unless the pillars and roof that hold it are impacted and deformed. Ammunition can penetrate a windshield due to its velocity. When an object hits the windshield, both layers of glass can fracture even if the object does not penetrate the glass.

Safety glass is used for all other vehicle windows except for windshields. When safety glass breaks, it will spider web and shatter into thousands of tiny pieces. These pieces are irregularly shaped and will never be perfectly round. Window tint adheres to safety glass and will keep the glass together if it breaks. Structural deficiencies in a rear window that is tinted will cause the window to fall out in one piece. However, birdshot can tear the window tint.

Kolter testified the bullet hole in the vehicle's rear window appeared to have broken the upper part of the window and landed in the roof but did not shatter the glass.

9.

The window tint would hold the glass together and an individual could drive the vehicle for a while. However, it is unlikely that driving at a high speed alone could cause the window to blow out. If the window fell out, he would also expect the window to remain in one piece. If a tinted window failed and hit the ground, the tint would cause the window to mangle or result in the glass breaking into large shards. The tint would tear only if something impacted it. Therefore, if the rear window splintered and cracked because the vehicle traveled over a bump or curb, it should remain in one piece due to the presence of the window tint and still retain its shape as a window.

If the rear window were hit by a shotgun blast, each pellet would impact the window and the glass would break and shatter into small pieces of safety glass. The window would instantaneously shatter and not just cause a cause a crack.

Birdshot flies at a faster velocity than glass and with much more force than broken glass. According to Kolter, glass pieces did not cause the small hole in patrol vehicle's windshield and only a pellet could have caused that damage. A piece of glass would cause an abrasion. The circular damage to the windshield and the perfectly round indentations in the patrol vehicle were caused by birdshot and not by irregularly shaped glass. Shattered safety glass would be irregularly shaped and would not leave a circular mark. If a vehicle's rear window failed, the safety glass is not substantial enough to crack the windshield of a vehicle behind it because the safety glass is flexible.

## B. Defense

Josue A. lived with defendant and defendant's mother, who Josue was dating. Josue was the registered owner of the vehicle and had given the vehicle to defendant a month prior to his arrest. Two days before defendant's arrest, Josue observed that the vehicle had two bullet holes, one of which broke the rear window. Josue saw that window tint held the window together, and he advised defendant to repair the window because it would shatter and fall completely if defendant drove over a bump.

10.

Defense counsel presented testimony that residue swabs from Santos's patrol vehicle did not show the presence of lead.

Defense counsel played a video that showed defendant's flight from Santos at the gas station. The surveillance video showed the vehicle as defendant drove it off the curb while pursued by a patrol vehicle. The curb height was eight and three-eighths inches.

Raymond Paladino, employed as a forensic examiner and accident reconstructionist, testified that the damage to Santos's patrol vehicle was made by glass shards and showed no evidence that it had been impacted by birdshot. He further testified that the damage to the right side of the patrol vehicle showed impacts too large to have been birdshot. Regarding damage to the patrol vehicle's push bumper, Paladino testified that it was not made by birdshot and was most likely caused by glass. In his opinion, the damage to Santos's patrol vehicle was caused by glass from the vehicle. Paladino testified that the vehicle's rear window was damaged from a bullet and could have been blown out as a result of driving over a bump at a high speed and with air pressure from an open window.

On cross-examination, Paladino acknowledged that he worked on three cases involving shootings more than 15 years prior to his testimony. When the prosecutor showed Paladino a photograph of damage to a vehicle, he testified that it could have resulted from birdshot. Upon learning that the photograph depicted Santos's patrol vehicle, Paladino testified that the damage was caused by glass.

## III. Gang evidence.

### A. Predicate Crimes

#### 1. Assault on Carlos H.

On June 6, 2013, Carlos H. was driving in Rexland Acres on his way to visit his son. A man in a wheelchair blocked the road and four other men surrounded Carlos H. When Carlos H. got out of his vehicle to ask the men to move, one man bearing a

Rexland tattoo beat Carlos H. and knocked him unconscious. He woke up in the hospital with a wound on the back of his head and a black eye. While Carlos H. testified that he did not remember additional details regarding the incident, at the time he told Senior Deputy Tanner Miller that a shirtless Hispanic man bearing a tattoo on his chest threw gang signals and ordered Carlos H. to leave the man's "Varrio" and to get out before the man "kick[ed] [Carlos H.'s] ass." Miguel Perez and defendant were arrested in Perez's backyard and both men, along with Justin Valencia, were convicted of assault with force likely to cause great bodily injury.

Deputy Brian Geherty, the prosecution's gang expert, testified that the assault on Carlos H. occurred in territory claimed by the Varrio Rexland Park criminal street gang (VRP), the individuals claimed ownership of the neighborhood and ordered Carlos H. to leave, the assault was a crime commonly committed by VRP, and the assault was committed by several VRP members including Perez (moniker "Pistola"), Valencia (moniker "Frost"), and defendant (moniker "Black" or "Blacky"). Geherty concluded that this crime benefited VRP by instilling fear in members of the community to strengthen the reputation of VRP and prevent members of the community from working against VRP.

### 2. *Church burglary*

In February 2015, police responded to a burglary at a church located in Rexland Acres, the same church where defendant abandoned the vehicle during the pursuit in the instant case. Perez and Louis Gomez tried to flee with electronics taken from the church. Both individuals were convicted of burglary. Geherty testified that burglary is a primary activity of VRP, the church was located within VRP's territory, and the crime was committed by Perez and Louis Gomez who were both active VRP members.

### 3. Shooting of Carlos U.

In March 2015, officers responded to a residence where Carlos U. had been shot in the chest. The shooting occurred in territory claimed by VRP. Perez was arrested and convicted of charges including assault with a firearm and participation in a criminal street gang. Perez had several gang tattoos showing his association with VRP including "KC," "South," and a clown face on his hand; "fuck the cops" and bullet holes on his chest; "R" on one arm and "P" on the other; and "RP" on his right shin.

Geherty testified that, in his opinion, this crime benefited VRP because assault with a firearm is one of the primary activities of VRP and the crime was committed within VRP's territory by Perez, a VRP member. Geherty opined that Perez was a VRP member based upon his tattoos, the writings found in his residence during one of the searches, and his clothing.

### B. Evidence of Defendant's Participation in a Criminal Street Gang

Geherty concluded that defendant was an active VRP member based upon several factors, one of which was defendant's tattoos that included "Rexland" across his chest and three dots under his ear symbolizing the Sureño gang of which VRP is a subset. Defendant's Facebook account included photographs of defendant displaying "Rexland" and "Surenos" tattoos. Geherty also interpreted several messages within defendant's Facebook account that reflected defendant's membership in VRP. Geherty based his opinion upon several law enforcement contacts with defendant, commencing in 2011, as described below.

In September 2011, Deputy Mario Magana responded to Rexland Acres and arrested defendant for public intoxication. He transported defendant to defendant's residence and searched the residence. Magana observed gang graffiti for the Rexland area gang. When conversing with Magana, defendant said that he had been hanging out with VRP for three to four years and had been jumped into the gang by three members.

13.

Also, in September 2011, a deputy contacted defendant who was with Antonio Gaytan and two other juveniles. The individuals attempted to flee from officers and were contacted near an inoperable car in which deputies later found drugs and a loaded firearm. Defendant was seated on a curb between two trash cans and a deputy found a pellet gun sitting next to him. The deputy saw graffiti on the trash cans, including the letters "VRP." Antonio Gaytan was convicted of participation in a criminal street gang.

In December 2012, Kern County Probation Officer Matthew Kundinger contacted defendant who was with Perez, Valencia, Antonio Gaytan, and Louis Gomez. Defendant had tattoos of a clown and "fuck you" on his left wrist and "CA" on his right arm.

Deputy Daniel Garcia of the Kern County Sheriff's Office responded to investigate a shooting at defendant's residence in February 2013. He found a brick that had been thrown through a window and two spent .45-caliber shell casings. Defendant said that the individuals who did it waited until he was not present because they were afraid of him. When Garcia advised defendant that Garcia heard defendant was a VRP member, defendant asked Garcia why he asked what gang defendant was with if Garcia already knew. Defendant said that the police could do nothing to help and that he would handle the situation himself.

In April 2013, Deputy Daniel Sanchez contacted Alexander Gaytan at his residence as part of a burglary investigation. During a search of the residence, Sanchez found the victim's stolen property and observed gang writings in the bedroom and outside the residence. Alexander Gaytan had gang tattoos. During further investigation in May 2013, Sanchez contacted Perez at his residence and, during a subsequent search, located writings that referenced VRP and other VRP members. Sanchez reviewed telephone calls Alexander Gaytan made from jail and, in April 2013, overheard defendant discussing the burglary and referring to the victim as a snitch.

14.

Sergeant Ryan Pitcher testified that that he responded to defendant's residence to arrest defendant pursuant to a felony warrant in December 2016. While transporting defendant, defendant spontaneously suggested that Pitcher should search defendant again. When Pitcher pulled over and searched defendant again, he found a .32-caliber firearm, loaded with seven shots, tucked below defendant's waistband. Defendant was convicted of being a convicted felon in possession of a firearm.

## C. Benefit of the Instant Offenses to VRP

Geherty testified that VRP had a saying, "[F]uck the rest," meaning that it rivaled with many other gangs. Although it rivaled with many other gangs, its number one rival was law enforcement. Geherty explained the meaning of graffiti found in defendant's neighborhood. The graffiti included several writings that claimed the territory belonged to VRP. The graffiti was signed by VRP authors and included defendant who used the moniker "Black." According to Geherty, the presence of defendant's moniker on the graffiti indicated that he was claiming ownership of it and allegiance to VRP. The graffiti also included "fuck 12," a derogatory reference to law enforcement. This reference was a declaration that law enforcement was one of VRP's rivals. Defendant's nickname was also displayed in graffiti in another part of the neighborhood alongside the names of Perez and defendant's brother.

Geherty explained that a gang member is driven by the need to acquire respect, which is earned by committing assaults and other crimes for the gang. The level of respect increases with the violent nature of the crime. A VRP member would earn a high level of respect for assaulting a member of law enforcement because it proves that they will go the distance for VRP, and "shooting or … killing … a cop, you are made. You are golden." Fellow VRP member Perez displayed tattoos of "VRP" on his stomach and "fuck the cops" with a bullet hole on his chest, indicating Perez was willing to kill an officer as a VRP member and that law enforcement was an enemy of VRP.

Geherty concluded that the instant offenses benefitted VRP based upon several factors: (1) the nature of the offenses, which were primary activities of VRP; (2) possession of ammunition indicated that defendant was using the firearm for offensive and defensive reasons; (3) the shots defendant fired intimidated the 911 caller who only reported the crime anonymously due to his fear of VRP; and (4) defendant fled through VRP territory. Geherty concluded that defendant's act of shooting at Santos benefitted defendant by increasing the respect shown to him by other VRP members and, therefore, increased the reputation of VRP itself. The violent nature of the offenses discouraged the community from cooperating with law enforcement against VRP by instilling fear and, in this way, assisted the VRP members in escaping punishment for their crimes. Possession of weapons by VRP members also strengthened VRP and increased its members' ability to successfully accomplish crimes that benefitted VRP.

## DISCUSSION

### I. The trial evidence was insufficient to support the jury's true findings as to the gang enhancements.

Defendant argues that the jury's true findings as to the gang enhancements on counts 2 through 4 are not supported by sufficient evidence. The People agree. Having reviewed the trial transcript, we agree with the parties that the evidence proved only that defendant was an active member in a criminal street gang, which is insufficient to prove that his crimes were intended to benefit the gang. (See *People v. Perez* (2017) 18 Cal.App.5th 598, 607 ["merely belonging to a gang at the time of the commission of the charged conduct does not constitute substantial evidence to support an inference the sole actor specifically intended to promote, further, or assist any criminal conduct by gang members"].)

Defendant further argues that reversal of the gang enhancements requires that we also reverse the firearm enhancements. In this case, defendant was charged with, and the

16.

jury found true, allegations that defendant personally discharged a firearm pursuant to section 12022.53, subdivision (c), which is independent of section 186.22, subdivision (b). Applicability of the firearms enhancements under section 12022.53, subdivision (c) is not affected by our conclusion that defendant's enhancements pursuant to section 186.22, subdivision (b) must be vacated.

Defendant's argument relies upon *People v. Lopez* (2021) 73 Cal.App.5th at pages 347–348. However, that case is distinguishable because in *Lopez* the jury found true a section 12022.53, subdivision (e) enhancement, which provides for additional punishment even if the defendant did not personally use or discharge a firearm but another principal did and the offense was committed to benefit a criminal street gang pursuant to section 186.22. (*Lopez*, at p. 480.) In *Lopez*, the court vacated one of Lopez's firearm enhancements because it was based upon another principal's firearm discharge, and the court vacated the section 186.22, subdivision (b) finding. (*Lopez*, at p. 480.) However, section 12022.53, subdivisions (b) through (d) provide for sentence enhancements where the defendant *personally* uses or *personally* discharges a firearm regardless of whether section 186.22, subdivision (b) is applicable. The court, despite reversing the section 186.22 enhancement, left intact Lopez's enhancements of 25 years to life pursuant to section 12022.53, subdivision (d) because the jury had found defendant personally discharged the firearm. (*Lopez*, at p. 481.)

Because the jury here found true that defendant personally discharged a firearm pursuant to section 12022.53, subdivision (c) and not section 12022.53, subdivision (e), the applicability of section 186.22 has no effect on those enhancements. Therefore, we reverse the true findings on only the gang enhancements as to counts 2 through 4.

In light of these reversals, we vacate the sentence in its entirety and remand the matter for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing

as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

**II.      The trial court did not err in denying defendant's motion to bifurcate the gang enhancements from trial of the underlying charges.**

###      A.      Background

Defense counsel moved to bifurcate trial of the gang enhancements. During hearing on the motion on March 17, 2021, the prosecutor argued that gang evidence was admissible as to all charges during the case-in-chief. The prosecutor explained that an expert would testify that police officers are the number one rival of VRP and asked that gang evidence be admitted as proof of defendant's motive and intent and absence of mistake in shooting at Santos. The prosecutor argued that such evidence was also relevant to explain defendant's action in returning to his neighborhood (VRP's territory) and discarding the firearm in an area where his associates could retrieve it. Defense counsel responded that gang evidence had very little relevance as to whether defendant discharged the shotgun at Santos's patrol vehicle and argued that defendant chose a route to his residence, which just happened to be in VRP's territory.

The trial court found that the gang evidence would be highly relevant on the issue of motive:

> "From what you both represented in your statement of facts, this was going to be a traffic infraction stop, turns into a felony evading, and then turns into an attempted murder, which leaves one wondering why, and it would appear that the why can be answered by motive, which isn't required to be proved or disproved by either side, but it is certainly helpful to understand how a felony evading or even a traffic stop could turn into an attempted murder."

The trial court then addressed whether the gang evidence should be excluded as unduly prejudicial pursuant to Evidence Code section 352:

> "[T]his type of evidence is prejudicial, but it does explain a lot of things regarding this case given the fact scenario and the proposed testimony.

> "So the question is whether in this type of situation, that evidence is unduly prejudicial such that it would outweigh any probative value.

> "[¶] … [¶]

> "In this case, I don't find that that outweighs its probative value. I find that the probative value outweighs that prejudicial effect."

Because the trial court found the evidence should be admitted as to the charged offenses, the court denied defendant's motion to bifurcate. The trial court agreed, however, that the jury should be instructed regarding the limited use of the gang evidence in accordance with Evidence Code section 1101, subdivision (b).

The jury was instructed with a modified version of CALCRIM No. 1403 as follows:

> "You may consider evidence of gang activity only for the limited purpose of deciding whether [] defendant acted with the intent, purpose and knowledge that are required to prove the gang-related enhancements charged or [] defendant had a motive to commit the crimes charged.

> "[¶] … [¶]

> "You may not consider this evidence for any other purpose. You may not conclude from this evidence that [] defendant is a person of bad character or that he has a disposition to commit crime."

### B.      Applicable Law and Standard of Review

"Bifurcation of gang allegations is appropriate where the gang evidence is 'so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt.' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952 (*Franklin*), quoting *People v. Hernandez* (2004) 33 Cal.4th

19.

1040, 1049 (*Hernandez*).) We review a trial court's denial of a motion to bifurcate "for abuse of discretion, based on the record as it stood at the time of the ruling." (*Franklin*, at p. 952 [refusal to bifurcate gang enhancement allegations]; see *People v. Merriman* (2014) 60 Cal.4th 1, 37 [an appellate court evaluates claims that the trial court abused its discretion in denying severance or ordering consolidation in light of the showings made and the facts known by the trial court at the time of the court's ruling].) We do not consider trial evidence not made apparent to the trial court in limine or events that take place during the trial, such as the prosecutor's argument, in deciding whether the trial court abused its discretion in denying bifurcation at the beginning of the trial. Our determination must be based "on the record as it stood at the time of the ruling." (*Franklin*, at p. 952.)

"To establish [a] criminal street gang enhancement, the prosecution must prove some facts in addition to the elements of the underlying crime, for example, that the criminal street gang has engaged in a 'pattern of criminal gang activity.' [Citation.] Accordingly, when the prosecution charges the criminal street gang enhancement, it will often present evidence that would be inadmissible in a trial limited to the charged offense." (*Hernandez*, *supra*, 33 Cal.4th at p. 1044.) However, the *Hernandez* court noted that "evidence of gang membership is often relevant to, and admissible regarding, the charged offense." (*Id*. at p. 1049.) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Ibid*.) Regarding motive, the court in *Franklin* observed that " ' "[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Franklin*, *supra*, 248 Cal.App.4th at p. 953.)

Our Supreme Court recently affirmed the importance of gang evidence as evidence of motive even where no gang enhancements were charged: " 'In general, "[t]he People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.' [Citation.]" [Citation.] "[E]ven where gang membership is relevant," however, "because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it." [Citation.] On the other hand, " '[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" [Citation.] On appeal, we review for abuse of discretion a trial court's ruling on whether evidence is relevant, not unduly prejudicial, and thus admissible.' " (*People v. Duong* (2020) 10 Cal.5th 36, 64–65.)

"Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Hernandez*, *supra*, 33 Cal.4th at p. 1050.) "[T]he trial court's discretion to deny bifurcation of a charged gang enhancement is … broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Ibid.*) " 'Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' " (*Ibid.*) *Hernandez* recognized the efficiencies achieved by a unitary trial in the bifurcation context. (See *ibid.*)

## C.    Analysis

### 1.    *No error in denying motion to bifurcate*

In denying the motion to bifurcate, the trial court concluded that the evidence in the prosecution's offer of proof established that the underlying charges involved gang

motives. In this regard, this case is similar to *Hernandez*, *supra*, 33 Cal.4th 1040, and *Franklin*, *supra*, 248 Cal.App.4th 938. Based upon the evidence of which the trial court was aware when it made its ruling, defendant was a VRP member fleeing from Santos into defendant's own familiar neighborhood and VRP's territory in order to avoid apprehension. By discarding the firearm in VRP territory, defendant increased the chances of recovering it later. Furthermore, testimony of a gang expert would establish that VRP viewed law enforcement as its number one rival and shooting at law enforcement would earn defendant tremendous respect. Evidence of gang graffiti and tattoos confirmed this testimony, and such evidence provided a motive for defendant to have shot at Santos rather than just fleeing to evade apprehension. The trial court did not abuse its discretion in determining that gang evidence was relevant to the non-gang charges in this case. The gang evidence explained defendant's willingness to shoot a police officer. (See *People v. Duong*, *supra*, 10 Cal.5th at p. 65 ["The gang evidence explained [Duong]'s willingness to shoot a complete stranger minutes after a verbal spat, along with the apparent coordination among defendant's associates to destroy the surveillance tape."].) Defendant was also a felon in possession of a firearm when Santos attempted to stop him, and defendant may have feared being returned to prison. "Of course, other motivations could have been at play," "[b]ut the possibility of other motivations did not preclude the prosecution from presenting evidence that gang affiliation was the precipitating factor." (*Ibid.*)

Therefore, we conclude that the trial court did not abuse its discretion in also denying defendant's motion to bifurcate. Independent of the gang enhancement allegations, much of the subject evidence was relevant, among other things, to defendant's motives in shooting at Santos and whether defendant intended to murder him. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1049.) With the exception of the evidence relevant to the predicate offenses (two of which did not involve defendant), the gang

22.

evidence was highly probative on these matters and inextricably intertwined with the underlying charges. As the trial court found, much of the evidence would have been admissible under Evidence Code section 1101, subdivision (b) even if the gang enhancement had not been alleged. (See *People v. Valdez* (2012) 55 Cal.4th 82, 131 [gang evidence admissible to show motive and identity and "because the gang-related evidence at issue was 'relevant to prove some fact … other than [defendant's] disposition to commit' crimes [citation], Evidence Code section 1101, subdivision (a), did not preclude its admission" (second bracketed insertion added)].)

Ultimately the gang evidence was insufficient to establish that defendant was acting with the specific intent to benefit VRP when he shot at Santos and fled to avoid apprehension. Defendant argues that because the evidence was insufficient to prove that defendant specifically intended to benefit VRP by his actions, such evidence was also insufficient to establish a motive for defendant's crimes. We do not agree. Regardless of whether defendant committed his crimes to specifically benefit VRP, his membership in VRP, which viewed law enforcement as its number one rival, provided him with a personal motive to harbor animosity against Santos and to shoot at Santos to earn the respect of his fellow VRP members. That defendant's gang membership reflected on only his personal motive does not make the evidence less relevant to motive as to the non-gang offenses. " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." ' " (*Franklin*, *supra*, 248 Cal.App.4th at p. 953.) Gang evidence may be admissible if relevant to explain an otherwise inexplicable attack. (See *People v. Beyea* (1974) 38 Cal.App.3d 176, 194–195, disapproved on another ground in *People v. Blacksher* (2011) 52 Cal.4th 769, 807–808.)

Considered against the context of all the evidence admitted in the case, any evidence admitted solely to prove the gang enhancement, and unnecessary to motive or

intent, "was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendant['s] actual guilt." (*Hernandez, supra*, 33 Cal.4th at p. 1051.) The predicate offenses as described by the gang expert included assault with force sufficient to result in great bodily injury, assault with a firearm, burglary, and a felon in possession of a firearm. These offenses were no more inflammatory than the charged offenses of attempted murder and shooting at a police officer from a vehicle, and only one of the predicate offenses involved defendant.

As defense counsel noted, the only issue for the jury to decide was whether defendant fired his shotgun at the officer. Defense counsel agreed that defendant evaded police, possessed an illegal shotgun as a felon, possessed ammunition, and was a gang member. The primary focus of that issue would be the physical evidence as to whether Santos's patrol vehicle was damaged by broken glass from defendant's vehicle's rear window or by birdshot from a shotgun blast, evidence not directly related to defendant's gang membership.

Furthermore, the trial court agreed to and did properly admonish the jury that gang evidence was only relevant as to defendant's intent and motive and could not be used to conclude that defendant was a person of bad character or that he had a disposition to commit crime. Therefore, we conclude that defendant failed to carry his burden " 'to clearly establish that there [was] a substantial danger of prejudice requiring that the charges be separately tried.' " (*Hernandez, supra*, 33 Cal.4th at p. 1051.)[2]

### 2. No denial of due process

Even if a trial court does not abuse its discretion based on the record before it at the time it ruled on the motion, reversal is required "if the defendant shows the failure to

---

[2] We further conclude that admission of such evidence was harmless as discussed further in part III of this Discussion.

24.

bifurcate resulted in ' " 'gross unfairness' amounting to a denial of due process." ' "
(*People v. Burch* (2007) 148 Cal.App.4th 862, 867; see also *Franklin*, *supra*,
248 Cal.App.4th at p. 953; *People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1434
[severance analysis involves two steps; if the trial court did not abuse its discretion in
denying severance based upon the evidence before it at the time of the ruling, "we look to
whether the defendant has demonstrated that the joinder resulted in 'gross unfairness'
amounting to a due process violation based on the trial evidence and other trial related
matters, such as the prosecutor's closing argument"].)

Defendant relies upon *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*),
a case wherein Albarran did not request bifurcation but moved to exclude the gang
evidence as irrelevant and unduly prejudicial under Evidence Code section 352.
(*Albarran*, at p. 217.) At the Evidence Code section 402 hearing, the trial court ruled that
the evidence was admissible to prove intent and motive even though the prosecution's
gang expert testified he did not know the reason for the shooting. (*Albarran*, at pp. 220,
227.) The expert also conceded at trial that there was no evidence that the shooters
exhibited any gang signals or announcements during the crime. (*Id*. at pp. 221, 227.)
After conviction, the trial court granted a new trial as to the gang enhancements but
denied a new trial as to the underlying charges, having decided that the evidence was
relevant to intent and motive. (*Id*. at pp. 217, 225, 226–227.) On appeal, the *Albarran*
court held that Albarran was entitled to a new trial on the underlying charges because the
gang evidence had no relevance except to show Albarran's disposition to commit a crime.
(*Id*. at p. 230.) The court concluded that the case "present[ed] one of those rare and
unusual occasions where the admission of evidence has violated federal due process and
rendered the defendant's trial fundamentally unfair." (*Id*. at p. 232.)[3]

---

[3] In *Albarran*, two men shot at a house where a birthday party was being held and then fled on foot after a failed attempt to commandeer a nearby vehicle. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 217–218.) In finding a lack of evidence that the crime was motivated by

We have already concluded that evidence of VRP's view of law enforcement as its number one rival was relevant to defendant's motive and specific intent in committing the crimes, distinguishing the instant case from that of *Albarran*. This is not a case where "no permissible inferences" could be drawn from the challenged evidence. (*Albarran*, *supra*, 149 Cal.App.4th at p. 229.) Even if evidence of the predicate offenses would not have been admitted in a bifurcated trial, the gang evidence that would not have been admitted but for the gang enhancements was no more inflammatory than the evidence related to the other charged offenses.

Significantly, the jury was instructed it could not infer bad character or criminal disposition from the gang evidence and that it could only use such evidence to determine whether defendant intended to kill Santos or had a motive to shoot or kill him. In the absence of any indication that the jury was unwilling or unable to follow the trial court's limiting instructions, it is presumed to have done so. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196; *Franklin*, *supra*, 248 Cal.App.4th at p. 953.)

Defendant has failed to show that an unbifurcated trial resulted in such gross unfairness as to amount to a due process violation. (See *Franklin*, *supra*, 248 Cal.App.4th at p. 953.)

## III.     Assembly Bill No. 333 requiring bifurcation.

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) amended section 186.22 (Stats. 2021, ch. 699, § 3) and added section 1109 (Stats. 2021, ch. 699, § 5) to the Penal Code. Section 1109, subdivision (a) provides that, upon request by the defense, a gang enhancement charged under subdivision (b) or (d) of

gang membership, the court noted that the shooters failed to announce their presence or purpose before, during, or after the shooting and there was no evidence that any gang members had bragged about their involvement or created graffiti and took credit for the crime. (*Id*. at p. 227.) However, given that defendant here was driving alone in a car when the crime occurred and was arrested immediately thereafter, we cannot find that the absence of similar evidence weighs against the relevance of a gang-related motive in shooting at Santos.

section 186.22 shall be tried separately after determination of the defendant's guilt of the underlying charge. Section 1109, subdivision (b) provides that a violation of section 186.22, subdivision (a) shall be tried separately from all other charges that do not require gang evidence as an element of the offense.

Defendant argues that the bifurcation requirement created by section 1109 applies retroactively to his conviction, which is not yet final. He further argues that the failure to bifurcate requires that we reverse the entire judgment so that his charges may be tried in a bifurcated proceeding in which the jury will first deliver a verdict on the underlying charges without being exposed to the evidence relating to the gang enhancements. The People disagree on both points.

As our Supreme Court has recently noted, case law is split on the question of whether section 1109 applies retroactively to convictions that are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*).) Some published opinions have held that section 1109 is not retroactive. (See, e.g., *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [majority holding § 1109 is not retroactive; concurrence holding it is retroactive], review granted Nov. 1, 2022, S277103; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same], review granted Aug. 17, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090). Other published opinions, including our own, have held that section 1109 is retroactive. (See, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 108; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1130 (*Ramos*); *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569 [majority holding § 1109 is retroactive; dissent holding it is not retroactive], review granted July 13, 2022, S274743.)

In *Tran*, our Supreme Court found it unnecessary to take a position on whether section 1109 applies retroactively to convictions that are not yet final, as any error in failing to bifurcate the trial of the gang enhancements was harmless. (*Tran, supra*, 13 Cal.5th at p. 1208.) As we will explain, we take the same approach here. Even

27.

assuming without deciding that section 1109 applies retroactively, the failure to bifurcate the trial of the gang enhancements was harmless error.

In supplemental briefing filed prior to our Supreme Court's issuance of *Tran*, defendant argues that the failure to bifurcate the trial of the gang enhancements constituted structural error that is not amenable to harmless error review and is therefore reversible per se. That position was rejected in *Tran*. (*Tran*, *supra*, 13 Cal.5th at p. 1208 [rejecting the defendant's "contention that the failure to bifurcate constitutes structural error"].) In most instances, when an error is one of state law, reversal is not warranted unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837; *People v. Lewis* (2021) 11 Cal.5th 952, 973 ["Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.' "].)

The now-existing requirement to bifurcate gang enhancements arises from a state-law statute (§ 1109), and a failure to follow section 1109 therefore constitutes an error of state law. As *Tran* recognized, certain errors of state law may require the application of the *Chapman*[4] harmless error standard if they rise to federal constitutional error under the due process clause by rendering the trial fundamentally unfair. (*Tran*, *supra*, 13 Cal.5th at p. 1209, citing *People v. Partida* (2005) 37 Cal.4th 428, 439.) However, like the defendant in *Tran*, defendant here has not persuaded us that the failure to bifurcate the gang enhancements created a fundamentally unfair trial within the meaning of the federal due process clause. (*Tran*, at p. 1209 [holding that "the prosecutor's use of the gang evidence here did not render the trial 'fundamentally unfair' "].) The trial was not fundamentally unfair due to the failure to bifurcate because, as we have discussed in part II.C.2., *ante*, most of the gang evidence presented at trial was relevant to the

---

[4]     *Chapman v. California* (1967) 386 U.S. 18, 26.

underlying charges and the limited amount of evidence relevant only to the gang enhancements was not particularly inflammatory.

As in *Tran*, having rejected the contention that the failure to bifurcate the gang enhancements rendered the trial fundamentally unfair, we apply the *Watson* harmless error standard. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.) Under that standard, we conclude that there is no reasonable probability of a different outcome were the gang enhancements to be bifurcated from underlying charges. This is because the vast majority of the gang evidence was relevant to prove the underlying charges and thus would have been presented to the jury even if the trial of the gang enhancements was bifurcated, as our Supreme Court explained in *Hernandez, supra*, 33 Cal.4th at page 1049. "[N]othing in Assembly Bill [No. ]333 limits the introduction of gang evidence … where the gang evidence is relevant to the underlying charges." (*Ramos, supra*, 77 Cal.App.5th at p. 1132.)

In this case, as we explained, defendant's gang connection was relevant to defendant's motive and intent in shooting Santos. While evidence as to the history of VRP or two of the three predicate acts may not have been admissible to prove motive, the trial court would have permitted the prosecution to admit evidence of VRP's animosity toward law enforcement, VRP's view of law enforcement as its number one rival, and the importance of violent crimes to a gang member attempting to gain respect from other gang members. As we already discussed, the other gang evidence that might not have been admitted had the trial been bifurcated was not so inflammatory that it likely biased the jury against defendant on the question of guilt. Because only the assault on Carlos H. involved defendant and the testimony did not specifically describe what defendant did during the offense, it is less likely that the evidence was unduly prejudicial to defendant. Furthermore, the three predicate acts were proved mostly by abbreviated testimony of law enforcement witnesses and conviction records. As the predicate acts involved assault

and burglary, those crimes were no more prejudicial than the attempted murder and shooting from a vehicle offenses charged against defendant. Defendant's prior contacts with law enforcement would have been admissible because the evidence of motive was based upon defendant's involvement with VRP and he admitted to gang association during these contacts.

As discussed herein, the trial court provided a limiting instruction to the jury regarding its consideration of the gang evidence. Perhaps the most significant indication that the jury followed this instruction lies in its acquittal of defendant for the attempted murder of Santos. The jury's ability to evaluate the evidence and acquit defendant of attempted murder demonstrates that it was not unfairly prejudiced against defendant based upon the gang evidence. (See *Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1132 ["Any inference of prejudice resulting from the gang evidence is dispelled by the fact the jury acquitted all the defendants of attempted murder and could not reach a verdict on the attempted voluntary manslaughter charges."].) As we discussed above, defense counsel advised the jury that the only issue was whether defendant fired his shotgun at Santos. Therefore, the primary focus of the jury's attention would be the physical evidence as to whether Santos's patrol vehicle was damaged by broken glass from defendant's vehicle's rear window or by birdshot from a shotgun blast. The jury's request for Santos's and Monsibais's testimonies regarding defendant's rear window and Santos's testimony regarding defendant's front driver's side window demonstrates its focus on the physical evidence to determine whether defendant fired at Santos. The jury's consideration of the physical evidence relevant to whether defendant's shotgun caused the damage to Santos's patrol vehicle indicates that the jury considered all the evidence and was not unduly prejudiced by the gang evidence.

We conclude that it is not reasonably probable that the outcome of the trial on the underlying charges would have been different in the absence of the gang evidence that

30.

would not have been otherwise admissible. Even assuming section 1109 is retroactively applicable in this case, the failure to bifurcate the trial of the gang enhancements was not prejudicial error.

## DISPOSITION

The true findings that counts 2 through 4 were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) are reversed. Defendant's sentence is vacated in its entirety and the matter is remanded for resentencing.

In all other respects, the judgment is affirmed.

HILL, P. J.

WE CONCUR:

POOCHIGIAN, J.

DE SANTOS, J.